## AMBROSE *v.* UNITED STATES.

CRIMINAL LAW; EMBEZZLEMENT; CRIMINAL INTENT; GUARDIAN AND WARD; EVIDENCE.

1. Embezzlement, which is a creature of statute, not being an offense at common law, is, generally speaking, a fraudulent conversion of another's personal property by one to whom it has been intrusted, with the intention of depriving the owner thereof. (Citing *Masters* v. *United States,* 42 App. D. C. 350, Ann. Cas. 1916A, 1243, and *Fulton* v. *United States, ante,* 27).

2. Evil intent, that is intent to defraud, is an essential element of the crime of embezzlement, as defined by sec. 841, D. C. Code (31 Stat. at L. 1326, chap. 854) providing that if any fiduciary, including a guardian, shall fraudulently convert property in his possession to his own use, he shall, in addition to forfeiting commissions, be deemed guilty of embezzlement.

3. The mere fact that a guardian has mingled the money of his ward with his own money does not afford a sufficient basis for the presumption of evil intent in a prosecution of him for embezzlement under sec.

Note.—Evidence of other crimes in prosecution for embezzlement, see note in 62 L.R.A. 226, 264.

On the question of intent, or offer, to return or actual return of property as affecting charge of embezzlement, see note in 52 L.R.A.(N.S.) 1013.

841, D. C. Code. For any loss so resulting he and the surety on his bond are liable civilly. (Citing *Mades* v. *Miller*, 2 App. D. C. 455).

4. Intent to defraud on the part of a guardian charged with embezzlement of his ward's money may be shown by circumstances surrounding the case. Evidence is admissible of the financial condition of the guardian at or immediately prior to the alleged offense, and of his failure to account for or turn over funds in his hands, but evidence of other similar offenses is inadmissible unless there is some connection between the acts shown and the one with which the accused is charged. (*Citing Gassenheimer* v. *United States*, 26 App. D. C. 432.)

5. In a prosecution of a guardian for embezzlement, where the prosecution has shown the deposit of the ward's money in the individual bank account of the accused and its withdrawal by him for his own use, it is error to exclude evidence offered by the accused of subsequent payment by the accused to his ward although not made from the same bank account, and the filing and approval of his account as guardian, and the fact that when such account was filed he had the proper balance on deposit, as such evidence is material upon the question of criminal intent.

6. In a prosecution of a guardian for embezzlement, it is error to permit the prosecution in cross-examining the accused to interrogate him concerning estates of which he had long previously been guardian or trustee.

No. 2901. Submitted April 3, 1916. Decided April 17, 1916.

HEARING on an appeal by the defendant on a judgment of the Supreme Court of the District of Columbia of conviction, on verdict, in a prosecution for embezzlement. *Reversed.*

The COURT in the opinion stated the facts as follows:

This appeal is from a judgment in the supreme court of the District convicting the defendant, William E. Ambrose, appellant here, of embezzlement and sentencing him to imprisonment for ten years.

Two indictments, containing a large number of counts, were consolidated for trial. At the conclusion of the evidence the government elected to stand on the 6th count of the first indict-

ment and the 7th count of the second indictment, and there was a verdict of guilty as to each.

The first of the above counts charged that the defendant, on May 7, 1912, was guardian of Clarence Limerick and Robert Limerick, and that on said date, as such guardian, he had in his possession $2,250 of the property of said minors, which had come into his possession as such guardian, and that he "did then and there unlawfully and fraudulently convert and appropriate the same to his own use, and did thereby then and there embezzle the same." The second of the above counts charged that on May 17, 1912, the defendant was guardian of Agnes Limerick and Oliver Limerick, and that he then had in his possession as such guardian the sum of $2,400, the property of said minors, which he unlawfully and fraudulently converted, as set forth in the first count.

The evidence for the government was in brief as follows: On April 24, 1912, defendant was appointed guardian of the above-named children in place of Mr. Floyd E. Davis, who had resigned. The oldest of these children, Agnes Limerick Allen, would be of age on September 11th, following. Defendant duly qualified, giving a bond in the penalty of $7,000. There was turned over to him an overdue note of a Mr. Weeks for $2,250, secured by a deed of trust (a similar note of Mary E. Lynham for $2,000, but not here involved); two notes of a Mr. Richards for $200 each, and two notes of Mr. Richards for $1,000 each. In addition to these notes, $224.60 in cash came into his hands. The Weeks' note was the property of Robert and Clarence Limerick, and the four Richards's notes, aggregating $2,400, were the property of Agnes and Oliver Limerick. The former guardian having made overpayments to these minors aggregating $466.10, the defendant immediately, out of his own moneys, refunded that amount. The father of these children was dead, but the mother was living, and the former guardian had paid the mother $30 per month towards the maintenance of the children.

The defendant immediately petitioned the court and was granted leave to sell the Richards's notes at not less than their face value, which he did, receiving therefor cash or its equiva-

lent. What was done with this money the government did not attempt to prove.

It next was shown that the defendant collected the overdue Weeks' note, the proceeds of which were placed in bank to his individual credit and mingled with his individual funds. The government then proved by bank officials that after the date of the deposit, on May 27, 1912, of the proceeds of the Weeks' note, the defendant issued checks against his account so that on July 31st following, the account showed an overdraft of $4.17.

Here the government rested.

Thereupon the defendant took the stand and explained that when he was appointed guardian, Agnes Allen was within a few months of reaching majority, at which time it would be necessary to settle with her; that he already had advanced some of his own money to the prior guardian, Mr. Davis, on account of the overpayments previously mentioned; that he did not remember whether he deposited the proceeds of the Richards's notes "in one account or in another account;" that when the Weeks' note was paid, "he charged himself as guardian with the receipt of the principal and the accumulated interest;" that he did not open any special account for this guardianship case. Upon being shown an account bearing the file mark of the clerk of the court June 15, 1914, entitled "Guardianship of Agnes Limerick, et al., First individual account, *final as to Agnes,*" he identified it as the account which he had filed, and also identified a number of vouchers accompanying the account and testified that those vouchers were for disbursements. Thereupon the account and voucher were offered in evidence. The government objecting, the court inquired as to "the date of the last entry made by the bank officer, who testified as to the closing of the account" (bank account), and, being informed that it was in July, 1912, sustained the objection, over defendant's exception.

The witness further testified that he paid $466 to Mr. Davis, the prior guardian, before he received either the notes or the cash from Mr. Davis. Upon stating that he had no independent recollection of the various receipts and dates of payment, he was shown a receipt, and testified that he made a payment of $30

to Mrs. Pote, mother of the minors, for their support on May 23, 1912, and offered the receipt in evidence. Thereupon counsel for the Government announced his intention to move the striking out of this receipt unless the defendant showed "some connection between these particular funds." Thereupon the court ruled that, to make this admissible, it must appear that these payments "came from the particular money deposited in the particular institution where he placed it to his individual credit, rather than to his credit as the fiduciary." Counsel for the defendant then offered to prove monthly payments of $30, commencing with the first payment on May 23, 1912, down to and including March, 1914. The district attorney then inquired whether these payments were by check out of a particular fund. Defendant's counsel answered that it was "by check out of these funds. I am not limiting it to any particular fund." Counsel for the defendant further offered to prove that out of the fund received from the proceeds of the Richards's notes and other funds in which Agnes Limerick Allen had a share, there was paid to her in full settlement, when she became of age in September, 1912, $2,276.51, and by error she was overpaid by the defendant to the extent of $265.37. Counsel further offered to prove the state of the other accounts, showing that defendant had the proper balance on deposit in the Security Savings & Commercial Bank, when he filed his account on June 15, 1914. The government objected to all the evidence thus offered and the court sustained the objection, to which ruling an exception was noted.

On cross-examination the government was permitted, over defendant's objection, to inquire concerning various cases in which he had acted in a fiduciary capacity.

The defendant was asked whether he reinvested the proceeds of the notes he collected as guardian, and replied that he used the proceeds in his business, "and accounted for it when I was called on for it." The latter part of the answer, upon motion of the district attorney and over the objection of the defendant, was stricken out by the court. The defendant's financial condition then was gone into, he testifying, in answer to the question whether in May of 1912 and for two years prior thereto he had

not been in financial distress, that in 1912 he was making an average of $16,000 a year, and that he had interests in various properties "which he then believed and now believes to have been worth at that time many thousands of dollars in excess of his liabilities. That he had no conception of any difficulties." He further testified that his income at that time was steadily increasing, and that in 1913 it was over $22,000.

*Mr. James S. Easby-Smith,* for the appellant, in his brief cited:

*Fields* v. *United States,* 27 App. D. C. 433; *Gassenheimer* v. *United States,* 26 App. D. C. 432; *Giva* v. *Shine,* 187 U. S. 199; *Kribs* v. *People,* 82 Ill. 425; *Masters* v. *United States,* 42 App. D. C. 350; *Malcolmson* v. *State,* 25 Tex. App. 267; *Meyers* v. *State,* 4 Ohio C. C. 570; *Moore* v. *United States,* 160 U. S. 268; *People* v. *Galland,* 55 Mich. 629; *People* v. *Hill,* — Cal. —, 34 Pac. 854; *People* v. *Hurst,* 62 Mich. 276; *Pickford* v. *Hudson,* 32 App. D. C. 480; *People* v. *Molineux,* 168 N. Y. 264; *Ryan* v. *United States,* 26 App. D. C. 74; *State* v. *Leonard,* 105 Pac. 163; *State* v. *Marco,* 50 Pac. 799; *State* v. *Meyers,* 10 Ohio Dec. Reprint, 746; *Thomas* v. *State,* 33 Fla. 464; *Woodward* v. *United States,* 38 App. D. C. 329; 15 Cyc. 529; D. C. Code, Sec. 834; D. C. Code, Sec. 841; note to *People* v. *Molineux,* 62 L.R.A. 193, 264.

*Mr. John E. Laskey,* United States District Attorney, and *Mr. Mabry C. Van Fleet,* Special Assistant, for the United States, in their brief cited:

*Baltimore & O. R. Co.* v. *Onorato,* 35 App. D. C. 383; 4 Bl. Com. 229; *Bottomley* v. *United States,* 1 Story, 135; *Columbia Heights Realty Co.* v. *Macfarland,* 31 App. D. C. 112; *Com.* v. *Tuckerman,* 10 Gray, 173; *Cooper* v. *Sillers,* 30 App. D. C. 567; 15 Cyc. 507; *District of Columbia* v. *Wilson,* 4 App. D. C. 90; *Dufour* v. *United States,* 37 App. D. C. 497; *Erie & P. Dispatch* v. *Stanley,* 123 Ill. 158; *Fagnan* v. *Knox,* 66 N. Y.

525; *Farmer* v. *State,* 34 S. W. 620; *Fields* v. *United States,* 27 App. D. C. 433; *Fleener* v. *State,* 58 Ark. 98; *Gleeson* v. *Virginia Mid. R. Co.* 1 App. D. C. 185; *Goodwyn* v. *State,* 64 S. W. 254; *Harris* v. *State,* 34 S. W. 922; *Herndon* v. *Givens,* 16 Ala. 161; *McCoy* v. *State,* 15 Ga. 205; *New York Mut. L. Ins. Co.* v. *Armstrong,* 117 U. S. 591; *O'Brien* v. *United States,* 27 App. D. C. 263; *Patterson* v. *United States,* 39 App. D. C. 84; *Presbrey* v. *Thomas,* 1 App. D. C. 171; *Rex* v. *Bazeley,* 2 East P. C. 571; *Robson* v. *State,* 83 Ga. 166; *Shinn* v. *Com.* 32 Gratt. 899; *Simmons* v. *Jaselli,* 38 App. D. C. 242; *State* v. *Liecham,* 41 Wis. 565; *State* v. *Noland,* 111 Mo. 473; *State* v. *Pratt,* 98 Mo. 482; *State* v. *Sienkiewiez,* 55 Atl. 346; *State* v. *Silva,* 130 Mo. 440; *State* v. *Thompson,* 32 La. Ann. 796; Statute 39 Geo. III. chap. 85; *Sullivan* v. *Capital Traction Co.* 34 App. D. C. 358; *Travers* v. *United States,* 6 App. D. C. 450; *United States* v. *Gilbert,* Fed. Cas. No. 15,205; *Wallach* v. *Macfarland,* 31 App. D. C. 130; 2 Wigmore, Ev. Sec. 1185; *Woodward* v. *United States,* 38 App. D. C. 323.

Mr. Justice Robb delivered the opinion of the Court:

Embezzlement is a creature of the statute, not being an offense at common law. Generally speaking, it may be defined as the fraudulent conversion of another's personal property by one to whom it has been intrusted, with the intention of depriving the owner thereof. *Masters* v. *United States,* 42 App. D. C. 350, Ann. Cas. 1916A, 1243; *Fulton* v. *United States, ante,* 27; *Moore* v. *United States,* 160 U. S. 268, 40 L. ed. 422, 16 Sup. Ct. Rep. 294, 10 Am. Crim. Rep. 283; *Grin* v. *Shine,* 187 U. S. 189, 47 L. ed. 135, 23 Sup. Ct. Rep. 98, 12 Am. Crim. Rep. 366. In 9 R. C. L. at page 1265, it is said: "It must be borne in mind, however, that the safest guide in determining what constitutes the crime of embezzlement, and what persons are amenable to the charge, is the statutes of the particular state in which the crime is prosecuted." Under the common-law definition it was found that many wrongdoers escaped; first, because it was

necessary that the stolen goods should have been at some time in the complaining party's possession; and, second, because if the possession of the goods was lawfully acquired, no subsequent conversion during the bailment constituted larceny. It was to meet these defects that embezzlement statutes were enacted. It is at once apparent that the principal difference between larceny and embezzlement lies in the manner in which possession of the property is acquired. In larceny there is a trespass, accompanied by an intent to steal, while in embezzlement there is a *fraudulent* conversion of property the possession of which was lawfully acquired. *Moore v. United States,* 160 U. S. 268, 40 L. ed. 422, 16 Sup. Ct. Rep. 294, 10 Am. Crim. Rep. 283. In either case, however, except under special statutes, evil intent must be shown. In many jurisdictions it is provided that a public officer who knowingly and unlawfully appropriates funds in his keeping to his own use is guilty of embezzlement, the purpose of such statutes being to prevent such public officials from using money coming to them in their official capacity for any purpose other than that for which it came to them. Such a statute was the 3d section of the act of June 14, 1866, "to regulate and secure the safe-keeping of public money." 14 Stat. at L. 65, chap. 122, Comp. Stat. 1913, § 10264; *United States* v. *Hartwell,* 6 Wall. 385, 18 L. ed. 830. A similar statute was under review in *People* v. *Warren,* 122 Mich. 504, 80 Am. St. Rep. 582, 81 N. W. 360. See also *State* v. *Ross,* 55 Or. 450, 42 L.R.A.(N.S.) 601, 104 Pac. 596, 106 Pac. 1022.

The statute involved in the present case is of a different character from those to which reference has just been made. It is section 841 of the Code [31 Stat. at L. 1326, chap. 854], relating to "Executors and Other Fiduciaries," including guardians, and provides that if any such fiduciary "shall *fraudulently* convert or appropriate" property in his possession to his own use, he shall, in addition to forfeiting all claims to commissions, costs, and charges thereon, be deemed guilty of embezzlement. Section 834, relating to "Embezzlement By Agent, Attorney, Clerk, or Servant," denounces a *wrongful* conversion; and we have recently held that evil intent is an essential element of this

crime. *Masters* v. *United States,* 42 App. D. C. 350, Ann. Cas. 1916A, 1243; *Fulton* v. *United States, ante,* 27. There is even greater reason for ruling that evil intent, that is intent to defraud, is an essential element of the crime denounced by section 841 than for so interpreting section 834, for the duties and powers of an executor or guardian are broader with respect to the management or control of funds coming into his hands than are generally exercised by an agent, attorney, or clerk. A guardian has complete charge of the property of his ward that comes into his possession, and must keep it properly and safely invested. While, of course, it is the better way for the guardian to keep money of his ward entirely separate from his own, the mere fact that he does not do so affords no sufficient basis for a presumption of evil intent. He is required to give a bond for the faithful discharge of his duties, and if he carelessly deposits funds of his ward in his own name or mingles such funds in a deposit of his own, and any loss results, he and his bondsman are responsible therefor. *Mades* v. *Miller,* 2 App. D. C. 455; *Jenkins* v. *Walter,* 8 Gill & J. 218, 29 Am. Dec. 539; *Otto* v. *Van Riper,* 164 N. Y. 536, 79 Am. St. Rep. 673, 58 N. E. 643; *Mulholland's Estate,* 175 Pa. 411, 34 Atl. 735; *O'Connor* v. *Decker,* 95 Wis. 202, 70 N. W. 286. In the case last cited, it was ruled that to entitle a guardian to protection from the loss of funds of his ward by the failure of a bank in which he deposited them, the deposit must clearly show that it was made by him as such guardian, and the letters "Guar" after his name, in the certificate of deposit, are insufficient.

We now will briefly review such cases as we think bear upon the questions here involved.

*People* v. *Page,* 116 Cal. 386, 48 Pac. 326, was the prosecution of a guardian for embezzlement under a statute similar to ours. The proof showed that, at the time of defendant's appointment, the ward's property consisted of a bank deposit of $3,561.01; that later an order was made by the court having jurisdiction, requiring the filing of an account, which order was not complied with until more than three years, when the account showed a small disbursement for the ward. It further was shown that the

guardian had drawn "out of the bank from time to time all but $51;" that later the proper court made an order requiring the defendant to pay a substantial portion of the ward's money for his maintenance, which was not done, whereupon an attachment was issued and returned, "Not served." Subsequently another order was made, requiring the defendant to appear and show cause why he should not file his account, but the citation on this order was returned, "Not served." A similar citation was issued later, the return showing that the "guardian could not be found." Citation by publication then was resorted to, whereupon the defendant appeared, and, after securing various continuances, permitted the matter to go by default. The defendant then was indicted, arrested in New York, where he had gone, taken back to California, and there tried and convicted. The court, in commenting upon the fact that the defendant had withdrawn from the bank most of the money which was on deposit there to the credit of the ward, said: "But this was not a criminal act, and did not show a criminal intent to misappropriate the money. He may have intended to deposit the money in some other bank, or to invest it in safe securities. * * * So far as appears, the defendant at the time of the trial may have still had all the money ready to be paid over on demand to any one authorized to receive it." The court ruled that the evidence did not justify the verdict, and therefore reversed the judgment.

In *State* v. *Disbrow,* 130 Iowa, 19, 106 N. W. 263, 8 Ann. Cas. 190, a guardian was convicted of embezzling funds belonging to his ward, under a statute to the same effect as that here involved. It appeared that he had been removed as guardian and a successor appointed, to whom he was ordered to account and make settlement with; that he had failed to comply with this order and had neither paid nor accounted for the money in his hands. The court said: "But not every wrongful conversion, even by a bailee or trustee without legal authority to sell is an embezzlement. To constitute that crime the conversion must be actuated by the fraudulent purpose to deprive the owner of his property. For instance, if this guardian, having collected $300 on a note held for his ward, and having at the same time a like

sum to his own credit in the bank, should without any fraudulent purpose use the trust money in his hands for private purposes, and then go at once to the bank and have the same amount transferred from his personal to his trust account, he would perhaps be chargeable with a technical conversion, but would not be guilty of embezzlement.  * * *  The section relied upon makes the criminal character of the act to depend not upon the failure to account, but upon the existence of a fraudulent intent on the part of the accused to deprive the beneficiary of his property."

The case of *Myers* v. *State,* 4 Ohio C. C. 570, 2 Ohio C. D. 712, is much in point, since it was a prosecution of a guardian for embezzlement under a statute like ours.  There, as here, the evidence showed a use of the ward's money by the guardian. The court said: "The principal legal question involved was whether a guardian having, as such, the legal custody and possession of money received by him for his ward, and having in good faith and with honest intentions, and expecting and intending to fully account for and return the same to his ward with proper interest, used it in his own business or in that of a partnership of which he is a member, and it was lost by the failure of his business or that of his firm, without any fraud on his part, is guilty of the crime of embezzlement under section 6842, Rev. Stats."  After pointing out that, under the statute, the crime by an officer charged with the safe-keeping and disbursement of public money, a conversion of such money to his own use completes the offense regardless of the motive actuating such conversion, the court said: "But under section 6842 it is entirely different, and the offense is committed only when the person having in possession property which came to him by virtue of his employment or position fraudulently converts it to his own use, intending to deprive the real owner of it."

*State* v. *McDonald,* 133 N. C. 680, 45 S. E. 582, was the prosecution of an agent of a fraternal society for the embezzlement of its funds.  The defendant requested the trial court to charge the jury that intent is an essential element of embezzlement, and must be shown beyond a reasonable doubt.  As the

evidence tended to show that the defendant had collected assessments, deposited them in bank to his individual credit, and had drawn out a substantial sum for his personal use, the court instructed the jury "that there was an appropriation of the money of the defendant to his own use, and that the law raised the presumption, as a matter of fact, that it was done with a fraudulent intent, and put the burden upon the defendant to rebut that presumption." The supreme court ruled that the trial court erred in not giving the instruction prayed and in giving the above charge to the jury. After defining embezzlement and calling attention to the statute of that State, which is substantially like ours, the court said: "We think, therefore, that the conversion of funds by a person who has been intrusted with them becomes criminal as an embezzlement only by reason of this corrupt intent, and it is as necessary for the State to establish the intent as a fact independent of the conversion as it is to prove the bad intent in a prosecution for larceny as a fact apart from the taking. The intent to defraud is no more implied in a case of embezzlement than the felonious intent is from the act of taking in a case of larceny. * * * It follows, therefore, from what we have said, that if the mere act of taking will not raise the presumption of a felonious intent in a prosecution for larceny, there can be no valid reason why the act of conversion should do so in the trial of an indictment for embezzlement." Later on in the opinion the court said: "The law does not punish the conversion of money, but the fraudulent conversion."

*State* v. *Moyer,* 58 W. Va. 146, 52 S. E. 30, 6 Ann. Cas. 344, was the prosecution of an insurance agent for the embezzlement of funds of the company. The statute, after declaring fraudulent conversion to constitute embezzlement, provided that in a prosecution therefor refusal or failure of the fiduciary to account within thirty days after proper demand would create a presumption of guilt. The court said: "It is the fraudulent intent that constitutes the offense,—the intention to make an absolute appropriation, as contradistinguished from a temporary use without any design to defraud the owner

or deprive him of his property.    If the legislature intended
to make the mere use of money or other property mentioned an
offense, it should not have used the language in the act, which
says, to 'embezzle or fraudulently convert to his own use.'"

In *State* v. *Reynolds,* 65 N. J. L. 424, 47 Atl. 644, it was
ruled that in all cases "which are of an uncertain, or general, or
special agency, where the time for the return of the funds col-
lected is indefinite, or not fixed, or which is at the pleasure of the
agent or servant, there a demand or other evidence of a fraud-
ulent intent to convert may be necessary to put the defendant
in a position of having fraudulently converted the money to
his own use.    It should be said, however, that a demand and
refusal does not of itself in any case establish conversion, or
conversion by a defendant to his own use, but that it is only evi-
dence to go to the jury upon the question of the defendant's
fraudulent conversion."

A pertinent suggestion was made by the court in *State* v.
*Strasser,* 83 N. J. L. 691, 85 Atl. 227, a prosecution of an at-
torney for embezzlement, as follows: "The defendant was not
being tried for unprofessional conduct, or even for a breach of a
civil contract, but for the criminal conversion of another's
money."    See also *Fitzgerald* v. *State,* 50 N. J. L. 475, 14 Atl.
746; 9 R. C. L. 1262, 1277; 15 Cyc. 491.

In the light of the foregoing, let us now consider the facts of
the present case.    The government contented itself with merely
showing, in the one instance, the receipt of funds of the ward by
the defendant, and, in the other, the receipt of funds, the min-
gling of those funds by the defendant with his own, the evidence
tending to show conversion thereof.    Had the defendant rested
at this point and moved for an instructed verdict, it would have
been the duty of the court to have granted the motion.    No stat-
ute or rule of court was shown to have been violated.    It was
perfectly proper for the defendant to collect the overdue note,
and it can hardly be contended that there was any culpability
in the same of the Richards's notes, because that sale was express-
ly authorized by the probate court.    There was no evidence what-
ever upon which the jury legitimately could have based a finding

that there had been a fraudulent conversion of those funds. As the court remarked in the *Page Case,* 116 Cal. 386, 48 Pac. 326, the defendant all along may have had the funds on deposit in another bank or in his safe, ready to respond to any proper demand upon him as guardian. In the absence of proof to the contrary, the presumption would be that he did. In other words, the presumption of innocence is not overthrown by mere rumor or suspicion.

The question naturally arises, how is intent to be proved or disproved. Manifestly, it must be proved by the circumstances surrounding a given case, and disproved by evidence tending to explain those circumstances. It is competent for the government to prove the financial condition of the accused at or immediately prior to the alleged offense. *State* v. *Moyer, supra; Govalos* v. *State,* 116 Ga. 592, 42 S. E. 708. This upon the theory that a man is presumed to know the natural and probable consequences of his acts. Hence if a guardian, without adequate available means to meet all his obligations as guardian, should mingle guardianship funds with his own and thereafter deplete the common fund, a jury would not be likely to attach much credence to his denial of an intent to defraud his ward. In other words, if the guardian's financial condition is such that it fairly may be said that any misappropriation of his ward's funds will be likely to result in loss to the ward, then that fact will have an important bearing upon the question of intent, as well as upon the related question of motive. Failure to account for or turn over funds in the hands of the defendant is a circumstance, as we have seen, which may be considered along with the other evidence. *State* v. *Reynolds, supra.*

While there is some authority for the proposition that evidence of other similar offenses is admissible (*Jackson* v. *State,* 76 Ga. 551), the decided weight of authority is to the effect that there must be some possible connection between the acts shown and the one on account of which the defendant is being tried. Thus, in *Gassenheimer* v. *United States,* 26 App. D. C. 432, 443, it was ruled that in a prosecution for knowingly receiving embezzled goods it was competent to show the receipt, at about

the same time *with knowledge that it had been stolen or embezzled,* of property of the same kind. In such a case the defendant would be tried for one of a series of offenses constituting a course of conduct or a general scheme. So, too, in *State* v. *Craddick,* 61 Wash. 425, 112 Pac. 491, it was held that in a prosecution for embezzling funds of an employer, evidence of other acts of the defendant in giving receipts to patrons of his employer and making entries on the books for less amounts than the money received, "was admissible for the purpose of showing a general scheme which he adopted in keeping his employer's accounts, as tending to show a system employed on his .part in furthering such embezzlement.

In *State* v. *Disbrow,* 130 Iowa, 19, 106 N. W. 263, 8 Ann. Cas. 190, it was expressly ruled that on a prosecution of a guardian for embezzlement, evidence of his appointment as guardian of other persons and his failure to account to them was inadmissible on the question of fraudulent intent. While the ruling was placed upon the ground that such failure to account neither proves nor implies embezzlement, the court was careful to say that it neither affirmed nor denied the soundness of the rule applied by the trial court.

As stated in 9 R. C. L. 1295, "generally, guilt can be established only by reasonable inferences drawn from the general course of conduct of the accused with respect to the subject-matter of his trust, and from all the facts and circumstances surrounding his act which tend to throw light upon or illustrate their nature." In *Reeves* v. *State,* 95 Ala. 31, 11 So. 158, the rule is well stated as follows: "A single act charged in an indictment, standing alone, might be susceptible of inferences of honesty of purpose, or of mere mistake; which, when viewed in the light of a long course of conduct, and of repeated acts of a similar nature intimately and directly connected with the particular accusation, would be utterly inconsistent with such inferences, and the fraudulent intent, with which the particular act was done, demonstrated beyond all reasonable doubt." Unless the evidence is to be thus restricted to acts "connected with the particular accusation," it is apparent that the defendant may

be charged with one offense and tried for half a dozen. If proof of the embezzlement by a guardian of the funds of ward "A" tends to show him guilty of a similar and later embezzlement of the funds of ward "B," the two transactions being entirely separate and distinct, then, logically, proof that a defendant on trial for larceny of the property of "A" at another time stole property of "B" would be admissible. The adoption of such a rule would be fraught with serious danger.

In the present case the court rejected all evidence as to payments from the defendant to his wards, and as to the account subsequently filed and approved by the probate court. This was upon the theory, first, that it had not been shown that those payments "came from the particular money deposited in the particular institution" to the credit of the wards; and, second, as to the account, that it had not been filed until after the depletion of the defendant's bank account, to which reference has been made. In our view, the evidence clearly was admissible. Evidence that the defendant met all his guardianship obligations promptly and in due course tended to throw light upon the question of intent. So all the authorities hold. Even in a case where the mere conversion of public funds by a public officer constitutes the offense, it has been held that the return of the property is a circumstance which should go to the jury for what it may be worth, as reflecting the motive of the trustee at the time of the appropriation, that is, as tending to disprove the allegation that the defendant was guilty of an appropriation. *Baxter* v. *State,* 91 Ohio St. 167, 110 N. E. 456. It would be a very unjust rule, indeed, that would permit the government to show failure on the part of the fiduciary to account for and pay over the funds in his hands, as tending to show fraudulent conversion, and preclude the defendant, where there was no evidence of such failure, affirmatively to prove both an accounting and payment, or offer of payment. The suggestion of the government, which seems to have been entertained by the learned trial justice, that when the account was filed with the probate court the crime of embezzlement already had been committed, does not take into account the very important consideration that

the jury weighing all the evidence, including this account, might conclude there never had been a fraudulent conversion by the defendant of the guardianship funds coming into his hands. It is not for us to assume the defendant's guilt, for that question is for the jury to determine in the light of all the circumstances surrounding the transaction.

The defendant was interrogated concerning estates which had been closed in 1910, or long prior to his appointment in the present case. From what we have said it is apparent that the answer to this inquiry could throw no light upon the issue involved, and the defendant's objection should have been sustained.

It is unnecessary further to discuss the assignments of error, since they are covered by our general discussion of the case.

The judgment must be reversed and a new trial awarded.

*Reversed.*

Mr. Chief Justice SHEPARD concurred in the judgment.